## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| BRENDA L. JAMES, | CASE NO. 1:20-CV-02607-BYP |
| Plaintiff, | JUDGE BENITA Y. PEARSON |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Brenda James filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision denying disability insurance benefits ("DIB"). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On November 19, 2020, pursuant to Local Civil Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a Report and Recommendation, and was subsequently reassigned to me pursuant to General Order 2021-06. (Non-document entry dated May 20, 2021). Following review, and for the reasons stated below, I recommend the District Court **REVERSE and REMAND** the Commissioner's decision.

### PROCEDURAL BACKGROUND

Ms. James filed for DIB on June 21, 2016, alleging a disability onset date of March 31, 2011. (Tr. 275). Her claims were denied initially and on reconsideration. (Tr. 183, 197). She then

requested a hearing before an Administrative Law Judge. (Tr. 217-18). Ms. James (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on November 22, 2017. (Tr. 99-145).

On May 16, 2018, the ALJ issued a written decision finding Ms. James not disabled. (Tr. 7-28). The Appeals Council denied Ms. James's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 404.955, 404.981).

Ms. James filed a complaint in this Court on March 14, 2019. (*See* Case No. 1:19-cv-00570-JRK, ECF #1). On February 20, 2020, following the parties' consent to his jurisdiction, then-Magistrate Judge James R. Knepp II reversed and remanded the Commissioner's decision. (*See* 1:19-cv-00570-JRK, ECF #15). The Appeals Council sent the matter back to the ALJ. (Tr. 903; *see* 20 C.F.R. § 404.977).

On August 5, 2020, Ms. James (represented by counsel) and a VE testified at another hearing before the ALJ, held by telephone. (Tr. 805). On September 9, 2020, the ALJ issued a written decision finding Ms. James not disabled. (Tr. 782-97). The Appeals Council did not assume jurisdiction, making the hearing decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.984. Ms. James timely filed this action on November 19, 2020. (ECF #1).

FACTUAL BACKGROUND

I. PERSONAL AND VOCATIONAL EVIDENCE

Ms. James was 53 years old at the time of her alleged onset date. (Tr. 172). Ms. James has a high school education. (Tr. 43). In the past, Ms. James has been employed as a housekeeper with Mercy Health, a teller with All Kind Check Cashing, and a finance assistant with Ed Mullinax Ford. (Tr. 114, 117, 118).

## II.    ADMINISTRATIVE HEARING

The following summarizes the testimony of Ms. James and the VE, presented during the hearings before the ALJ on November 22, 2017 and August 5, 2020.[1]

Ms. James has rheumatoid arthritis and fibromyalgia. (Tr. 127, 131).

During the relevant period, Ms. James lived in a small house with her husband.[2] (Tr. 107-08). Her husband prepared the majority of meals, but Ms. James was able to serve herself cereal and make sandwiches if she sat in a chair while doing so. (Tr. 108, 812). Ms. James engaged in few household chores, such as vacuuming and doing laundry, but required breaks before completing the tasks. (*Id.*). Her husband carried the basket of laundry to and from the basement and would fold the laundry. (Tr. 109). Ms. James could not wash dishes because her hands cramp and her back spasms. (Tr. 127). Her husband did the grocery shopping and also shopped for any personal items Ms. James needed. (Tr. 109). Ms. James did not accompany her husband to the grocery store. (*Id.*).

Ms. James was able to drive during the relevant period, but would only travel short distances, like a quarter mile to the drug store. (Tr. 110). Ms. James relied on her sons to drive her longer distances. (*Id.*). Ms. James testified she could not sit still enough to drive for longer than a half hour to an hour. (*Id.*).

---

[1]    The ALJ held two administrative hearings, one before remand from this Court and one after remand. (*See* Procedural Background). Ms. James requested the ALJ consider testimony from both hearings, both of which consider Ms. James's functional abilities during the relevant period. (Tr. 809). I therefore summarize the testimony from both hearings.

[2]    At the time of the second administrative hearing, Ms. James had separated from her husband and was living in an apartment. (Tr. 107). The ALJ asked Ms. James to confine her answers to the relevant period, between March 26, 2015 and December 31, 2015. (Tr. 103, 107-08).

Ms. James described herself as "a hermit in [her] own house." (Tr. 112). Ms. James can still play cards, but rheumatoid arthritis causes her hands often stiffen up, leaving them bent. (Tr. 111-12, 127). Her hands stiffen with use and when they are in water for too long. (Tr. 820). She used to weed the garden, cut the grass, and maintain a pool, but her conditions keep her from engaging in these activities. (Tr. 110-11). She is no longer able to ride on a motorcycle, go to a concert, or shop at flea markets, activities she formerly enjoyed with her husband. (Tr. 113, 824). Ms. James has two grandchildren but does not babysit. (Tr. 113-14). She does not belong to any clubs, organizations, or groups. (Tr. 114). Ms. James endorsed memory loss and concentration issues as fibromyalgia-associated symptoms. (Tr. 131). Ms. James also testified her pain interferes with her ability to concentrate and she struggles to complete tasks. (Tr. 132). She watches television but does not comprehend the storyline well and cannot remember some of what she watches. (Tr. 133).

Ms. James testified she declined to have back surgery and tried physical therapy and pain pills for relief. (Tr. 121). Physical therapy did not help. (*Id.*). She experienced more stiffness for several days after a physical therapy session. (Tr. 122). Ms. James enjoyed aquatic therapy but stiffened up when she got to the cold changing room. (Tr. 121).

Beginning around 2013 or 2014, Ms. James received prescriptions for a narcotic pain reliever, Norco, one pill every eight hours. (Tr. 122-23). Ms. James last received a Norco prescription a couple of months before the first administrative hearing. (Tr. 123). Ms. James takes Celebrex and vitamin D for fibromyalgia pain, and a sleep aid. (Tr. 131, 824). Ms. James had to discontinue Lyrica due to stomach issues and weight gain. (*Id.*).

In 2015, Ms. James's doctor recommended bilateral hand braces for daytime and nighttime wear. (Tr. 130). The braces relieve some of her hand pain. (Tr. 820). Ms. James uses a cane every day. (Tr. 133). It offers her stability, especially on stairways. (*Id.*). Ms. James's doctor did not prescribe the cane but said "if you need it, use it." (Tr. 134).

The ALJ asked Ms. James how she enjoyed her cruise vacation to Haiti in 2016. (Tr. 125). Ms. James testified it was beautiful and the warmer weather was relaxing. (*Id.*). In response to the ALJ's question about the airplane ride, Ms. James testified she was nervous because it was her first time flying but the plane did not hit any turbulence. (*Id.*). Ms. James did not do a lot of walking during the vacation; she used taxi transportation whenever she left the ship. (Tr. 126).

The VE at the first hearing then testified. He described Ms. James's past relevant work as follows:

- Cleaner, hospital (DOT 323.687-010), medium exertion as generally and actually performed, unskilled, Specific Vocational Preparation ("SVP") 2;

- Check cashier (DOT 211.462-026), sedentary exertion as generally performed, light as actually performed, semiskilled, SVP 3; and

- Finance secretary (DOT 201.362-030), sedentary exertion as generally performed, medium as actually performed, skilled, SVP 6.

(Tr. 136).

**Hypothetical 1.** The ALJ posed the following hypothetical individual and asked if such an individual could perform Ms. James's past relevant work: an individual of Ms. James's age, education, and vocational profile who is able to occasionally lift and carry twenty pounds, ten pounds frequently; stand and walk for six hours of an eight-hour work day; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; must avoid concentrated exposure to extreme cold and heat; must avoid all exposure to

5

dangerous machinery and unprotected heights; and must have the opportunity to alternate between sitting and standing at about 30 minute intervals. (Tr. 137).

The VE testified such an individual could perform Ms. James's past relevant work as a check cashier, but not the cleaner or finance secretary positions. (Tr. 137-38). The VE also listed other positions the hypothetical individual could perform:

- Mail clerk (DOT 209.687-026), light exertion, unskilled, SVP 2;

- Inspector and hand packager (DOT 559.687-074), light exertion, unskilled SVP 2; and

- Storage facility rental clerk (DOT 295.367-026), light exertion, unskilled SVP 2.

(Tr. 138).

**Hypothetical 2.** The ALJ asked the VE if that same hypothetical individual could perform Ms. James's past relevant work or any of the other positions identified if that individual was restricted to frequent bilateral handling and fingering. (*Id.*). The VE responded such an individual could perform Ms. James's past relevant work and all the other identified positions. (*Id.*).

**Hypothetical 3.** The ALJ asked the VE if the original hypothetical individual could perform Ms. James's past relevant work or any of the other identified positions if the individual was further restricted to occasionally lifting and carrying ten pounds, five pounds frequently, and can stand and walk for two hours in an eight-hour workday. (Tr. 139-40). The VE responded that such an individual could perform work as a check cashier as generally performed. (Tr. 140).

**Hypothetical 4.** Even if the hypothetical individual was further restricted to frequent bilateral handling and fingering, that individual could perform Ms. James's past relevant work. (*Id.*).

On cross-examination, the VE testified that an individual limited to simple, routine tasks would not be able to perform Ms. James's past relevant work, nor would an individual who is limited to occasional bilateral handling and fingering. (Tr. 142). If the originally hypothetical individual was restricted to occasionally carrying and lifting ten pounds, five pounds frequently; standing and walking for two hours in an eight-hour workday; and would require the ability to lean on a cane or other structure while standing, that individual would not be able to perform Ms. James' past relevant work. (Tr. 143).

At the second hearing, a VE also testified. She described Ms. James past relevant work:

- Cleaner, hospital (DOT 323.687-010), medium exertion as generally and actually performed, unskilled, Specific Vocational Preparation ("SVP") 2;

- Check cashier (DOT 211.462-026), sedentary exertion as generally performed, light as actually performed, semiskilled, SVP 3; and

- Contract clerk (DOT 219.362-026, sedentary exertion as generally performed, light as actually performed, skilled, SVP 5.

(Tr. 826).

The ALJ posed **Hypothetical 1** (see above) to the VE and asked if such an individual could perform Ms. James's past relevant work. (Tr. 826-27). The VE responded that the individual could perform work as a check cashier and a contract clerk. (Tr. 827). If the individual was further restricted to simple, routine tasks consistent with unskilled work, with no fast pace or high production quotas, and infrequent change, the individual would not be able to perform those positions. (Tr. 827-28). The VE identified other light, unskilled, SVP 2 positions such an individual could perform:

- Office helper (DOT 239.567-010);

- Cashier II (DOT 211.462-010); and

- Ticketer (DOT 229.587-018).

(Tr. 828). If, under the original **Hypothetical 1**, the individual was restricted to occasional

handling and fingering bilaterally, the individual would be precluded from work. (Tr. 829).

An individual under the restrictions posed under **Hypothetical 3** (see above) could

perform Ms. James's past relevant work as a check cashier and a contract clerk, as generally

performed. (Tr. 829-30). If the hypothetical individual was further restricted to simple, routine

tasks consistent with unskilled work, with no fast pace or high production quotas, and infrequent

change, the individual would not be able to perform those positions. (Tr. 830).

### III.    RELEVANT MEDICAL EVIDENCE

Margaret Tsai, M.D., a rheumatologist, evaluated Ms. James during a June 2014 visit for

fibromyalgia. (Tr. 469). Ms. James reported intermittent stiffness in her neck and shoulders, rated

eight on a ten-point scale, and worse in cold temperatures. (*Id.*). She also reported hand pain, and

left knee and leg pain. (*Id.*). Ms. James endorsed joint swelling, morning stiffness, low back pain,

dry mouth, GERD, bluish fingers, and fatigue. (Tr. 470). She claimed to get just five hours of sleep

a night. (*Id.*). Celebrex helped with pain but she stopped taking it due to cost; she took Motrin

three times a day and Vicodin. (Tr. 469).

Dr. Tsai noted 16/18 tender points and tenderness in Ms. James's feet, hands, thumb,

wrists, shoulders, knees with right greater than left, hips, and groin. (Tr. 471). Dr. Tsai also noted

diffuse tenderness in Ms. James's neck and back. (*Id.*). Dr. Tsai prescribed Pepcid, clonidine,

trazadone, diazepam, gabapentin, wrist splints, and occupational therapy for bilateral hand pain.

(Tr. 472). She also encouraged Ms. James to stop smoking and recommended she partake in

weight-bearing aerobic exercises for 30 minutes three times a week. (*Id.*).

In July 2014, Ms. James attended an occupational therapy evaluation, where she reported bilateral wrist and thumb pain that worsened with use. (Tr. 466). She endorsed difficulty with daily tasks, including opening jars, folding clothes, and typing. (*Id.*). At the second session, Ms. James reported she was comfortable using the wrist splints but continued to have bilateral thumb pain. (Tr. 459).

During her next appointment with Dr. Tsai, Ms. James reported 7/10 "head to toe" pain, including in her shoulders bilaterally, lots of stiffness, and fatigue. (Tr. 462). She also reported that gabapentin caused spasms and the TENS unit increased her neck pain. (*Id.*). Ms. James noted she was due for another knee injection soon. (*Id.*). On examination, Ms. James displayed 16/18 tender points and had tenderness in her joints. (Tr. 463). Examination was otherwise normal. (Tr. 463-64). Dr. Tsai referred Ms. James for a pain management consultation and prescribed a trial of Lyrica. (Tr. 464). The following day, lab results revealed Ms. James had low vitamin D and "mildly high inflammatory test." (Tr. 461). Dr. Tsai prescribed vitamin D capsules and hydroxychloroquine. (*Id.*).

Ms. James saw Frank M. Sabo Jr., M.D., for left hip pain, described as sharp and stabbing. (Tr. 460). After physical examination and review of Ms. James's hip x-rays, Dr. Sabo believed her pain stemmed from trochanteric bursitis. (*Id.*). He offered Ms. James a cortisone injection and recommended physical therapy. (*Id.*).

In September 2014, Ms. James underwent an initial pain management evaluation for fibromyalgia. (Tr. 456). She reported pain all over her body that was aching, burning, dull, and sharp, rated 7/10, that was aggravated by bending, lifting, walking, standing, heat, weather, cold, and movement. (*Id.*). Ms. James also reported difficulty falling and staying asleep. (Tr. 457). On

examination, Ms. James had tenderness over her bilateral cervical, thoracic, and lumbar facets, and limited neck range of motion with lateral bending bilaterally. (Tr. 458). Her provider prescribed trials of Celebrex, Lyrica, and Zanaflex; she also recommended aquatic therapy. (*Id.*).

During her physical therapy evaluation for low back pain, Ms. James reported constant, aching, widespread pain that was worse with movement and disturbed her sleep. (Tr. 453). The therapist set goals for Ms. James to meet during the course of therapy, including to stand and walk for 30 without pain and to sit for 30 minutes without pain so that Ms. James could play cards. (Tr. 455). The therapist noted that, during her first aquatic therapy session, Ms. James was able to perform therapy exercises with less discomfort. (Tr. 453). Ms. James reported decreased pain by the end of the session. (*Id.*).

In October 2014, Ms. James returned to the pain management clinic and reported all over body pain and right hip pain, constant and throbbing. (Tr. 446). She noted that water therapy helped but that she returned to baseline pain after leaving the pool. (Tr. 447). Ms. James made this same complaint during her aquatic therapy session the following day. (Tr. 446). The doctor diagnosed Ms. James with right hip greater trochanteric bursitis and gave her a hip injection. (Tr. 442). The injection provided pain relief for a week. (Tr. 439).

Ms. James returned to the pain management clinic in November and reported all over body pain. (*Id.*). On examination, her neck had good range of motion. (Tr. 440). She had tenderness over her bilateral lumbar facets, a positive facet loading test on the left, tenderness over the bilateral lumbar paraspinal muscles, and difficulty transitioning from sitting to standing. (*Id.*). Lumbar spine x-rays revealed bilateral spondylosis at L5, a severe disc space narrowing at L5-S1, and grade 2 anterolisthesis of L5 on S1. (Tr. 510). The doctor increased her dosage of Lyrica,

10

prescribed a narcotic for pain relief, and refilled Ms. James's prescription for Celebrex. (Tr. 440).

She underwent a diagnostic left lumbar medial branch nerve block, which provided 80 percent

pain relief for six hours before returning to pre-injection levels. (Tr. 434).

In December 2014, Ms. James returned to the pain management clinic with low back pain,

bilateral hip pain, and all-over body and joint pain from fibromyalgia. (Tr. 432). She explained her

pain was aggravated by standing, forward flexion, lifting, and walking, and mitigated by sitting and

medication. (*Id.*). She had tenderness over her bilateral lumbar facets, a positive facet loading test

on the left, tenderness over the bilateral lumbar paraspinal muscles, and difficulty transitioning

from sitting to standing. (Tr. 433). The doctor noted Ms. James gained four pounds after

increasing Lyrica and thereafter decreased her dosage. (Tr. 434). The doctor also increased the

dosage of her prescription for Norco for pain coverage. (*Id.*). A lumbar MRI revealed grade 3

anterolisthesis of L5 on S1 secondary to bilateral chronic L5 pars defect resulting in mild spinal

canal narrowing and severe bilateral foraminal narrowing. (Tr. 430).

In January 2015, Ms. James met with Tiffany Perry, M.D., a neurosurgeon, to discuss her

low back pain and radiating leg pain. (Tr. 425). Ms. James reported a three-year history of low back

pain radiating into her legs, described as stiff and aching. (*Id.*). After reviewing the MRI results, Dr.

Perry recommended surgery, a fusion at L4-S1 with interbody grafts. (Tr. 427). Dr. Perry informed

Ms. James she would need to quit smoking before undergoing surgery. (*Id.*).

During an office visit with Dr. Tsai on January 30, 2015, Ms. James reported neck pain

radiating to her shoulders and lower back pain radiating to her hips, rated 6/10 but worse with

walking. (Tr. 422). Ms. James also complained of hip pain, right greater than left, and reported her

knee pain was better with injections. (*Id.*). On examination, she had tenderness in her feet, hands,

shoulders, knees, hips, groin, and back. (Tr. 423). Diagnoses included secondary osteoarthritis, fibromyalgia, knee pain, hand pain, and fatigue. (*Id.*). She was referred to physical therapy and received a right hip injection. (Tr. 424-25).

At a February 2015 pain management visit, Ms. James continued to report neck and bilateral shoulder pain, which she rated as a 5/10. (Tr. 417-18). Ms. James reported her pain was aggravated by above-the-shoulder activities, standing for too long, and doing dishes, and mitigated by medication and using the TENS unit. (Tr. 418). On examination, Ms. James had good range of motion in her neck, and minimal pain with extension. (Tr. 419). She had full range of motion in her back, and no pain on palpation of the lumbar spine; however, she had tenderness over the bilateral paraspinal muscles. (*Id.*).

Ms. James met with Dr. Tsai in March 2015 and complained of neck pain radiating to her upper back, bilateral hip pain, bilateral knee pain. (Tr. 412). Ms. James informed Dr. Tsai that she recently fell on uneven pavement, causing knee pain. (*Id.*). Physical examination revealed joint tenderness in her feet, hands, shoulders, hips, knees, and groin, and diffuse tenderness in her neck and back. (Tr. 414). Dr. Tsai gave Ms. James a right knee injection. (Tr. 416).

Ms. James returned to the pain management clinic later that month and reported increased neck and shoulder pain, low back pain, and cramping in her lower legs and feet at night. (Tr. 409, 411). On examination, Ms. James had good neck range of motion, but tenderness over the left cervical paraspinal muscles, and decreased left shoulder range of motion due to pain. (Tr. 410). She had full strength and sensation. (Tr. 411).

Ms. James went to the pain management clinic again in June 2015 and reported right sided neck pain radiating to her right shoulder, and low back pain. (Tr. 407). Ms. James advised the

provider that she had been taking her Norco once every 4-6 hours instead of every 8 hours, as prescribed. (*Id.*). The provider told Ms. James she must take the pain medication only as prescribed.[3] (*Id.*). On examination of her neck, tenderness over the right cervical facets/paraspinal muscles, limited range of motion, and pain with extension and flexion. (*Id.*). A cervical spine x-ray revealed degenerative changes at C5-C6 and C6-C7, as well as moderate bilateral neural foraminal narrowing on the left C6-C7. (*Id.*). The provider diagnosed cervical spondylosis and facet arthropathy in addition to fibromyalgia and recommended physical therapy and a cervical facet medial branch block. (*Id.*). Ms. James canceled the cervical block due to car issues. (Tr. 403).

Ms. James returned to the pain clinic in July 2015 with reports of global joint, back, and muscle pain that worsened with movement and activity. (*Id.*). On examination of her neck, tenderness over the right cervical paraspinal muscles, limited range of motion, and pain with extension and flexion. (Tr. 404). The provider suggested rescheduling the cervical block and beginning physical therapy. (*Id.*). Ms. James rescheduled the cervical block in August 2015 but canceled that procedure as well. (Tr. 401).

In September 2015, Ms. James saw Dr. Tsai and complained of stiffness in her back and all over pain, 9/10. (Tr. 397). Ms. James explained the pain management clinic would no longer prescribe Norco because she took more than prescribed due to increased pain. (*Id.*). On examination, she had full range of motion, but diffuse tenderness in her neck and back, as well as in her hips, knees, feet, shoulders, and hands. (Tr. 399). Her strength was intact. (*Id.*). She had "findings consistent with generalized pain due to chronic fibromyalgia (sites of pain all over)." (*Id.*).

---

[3]     Days later, a Physician Assistant with the pain management clinic informed Ms. James that the clinic could not continue providing narcotic therapy because her pain panel was abnormal. (Tr. 405).

In November 2015, at the pain management clinic, Ms. James described low back and neck pain rated 8/10; it was aggravated by physical activity. (Tr. 393). On examination, she had tenderness over the right cervical facets. (Tr. 394). The provider's assessment was "chronic pain secondary to fibromyalgia; presenting with neck pain radiating to right shoulder and low back pain." (Tr. 394). The provider again encouraged Ms. James to reschedule the cervical block and start physical therapy. (Tr. 394-95). Ms. James's insurer ultimately denied the cervical block in November because Ms. James had not received physical therapy in the previous six months. (Tr. 393).

In January 2016, Ms. James saw a physical therapist, describing chronic neck and back pain for over the prior five years. (Tr. 389). Ms. James reported worsened pain with walking, movement, and picking up objects. (Tr. 390). On examination, the therapist noted moderate limitation in cervical flexion, retraction, and rotation, and major limitation in extension. (Tr. 390-91). Ms. James also had major limitation in lumbar flexion and extension, and moderate limitation in side-glide right and left. (Tr. 391). The provider described "moderate to severe loss of motion in the cervical and lumbar spine. (*Id.*).

In April 2016, Ms. James continued to report bilateral neck and shoulder pain rated 7/10; it was aggravated by physical therapy and exercise. (Tr. 383). On examination in April, and again in August, Ms. James continued to have tenderness in multiple locations including her neck and back, as well as full range of motion. (Tr. 385, 696).

Ms. James did not have any mental health treatment prior to December 31, 2015, her date last insured. In March 2016, Ms. James saw Jose Mendoza, M.D., to follow up on her lower back pain, as well as "discuss attention issues" (Tr. 552). Ms. James reported sleep disturbance,

14

dysphoric mood, agitation, a nervousness. (Tr. 554). On examination, she had a normal mood and affect. (*Id.*). Dr. Mendoza diagnosed fibromyalgia and attention deficit disorder; he referred Ms. James to neurology to follow up. (Tr. 555).

In April 2016, Ms. James saw neurologist Sanjay Parikh, M.D. (Tr. 682). Dr. Parikh noted that based on Ms. James's history it was "[his] impression that she does have a combined type of ADHD, which has been there since early childhood, but lately the symptoms are being aggravated by her lack of sleep, chronic pain and medical conditions." (*Id.*). He assessed, *inter alia,* ADHD, and prescribed Tenex. (*Id.*).

Ms. James returned to Dr. Parikh the following month, reporting that Tenex was not helping. (Tr. 685). However, Dr. Parikh also noted Ms. James was "feeling a little better on Tenex, but is still having issues with her attention span and concentration." (*Id.*). She reported memory loss and "[f]orgetting simple things." (*Id.*). Dr. Parikh ordered an EEG and instructed Ms. James to continue the medication. (Tr. 686).

In June 2016, Dr. Parikh noted Ms. James "ha[d] done well with her Tenex and she can tell a big difference when on the medication compared to off the medication." (Tr. 688). Dr. Parikh continued the Tenex and instructed Ms. James to return in three months. (*Id.*).

## IV. MEDICAL OPINIONS

In August 2016, State agency physician Esberdado Villanueva, M.D., reviewed Ms. James's records. (Tr. 172-182). He offered an RFC that was an adoption of the March 2015 ALJ decision, citing Acquiescence Ruling 98-4. (Tr. 180-81). The RFC included the ability to lift or carry 20 pounds occasionally and 10 pounds frequently, standing/walking/sitting six hours in an eight-hour workday, a sit/stand option at 30-minute intervals, some postural restrictions, avoiding

concentrated exposure to temperature extremes, and avoid all exposure to hazards. (Tr. 179-80). The State agency physician determined that Ms. James's statements were consistent with her medically determinable impairments, including fibromyalgia, but not fully consistent in the severity. (Tr. 178). Here, the agency physician discounted her complaints (gripping issues with the right hand, legs giving out, and an inability to sit and stand for periods of time) because her April 2016 neurology evaluation was normal other than a slightly unsteady gait. (*Id.*). State agency physician Aracelis Rivera, Psy.D., reviewed Ms. James's records and opined there was not sufficient evidence to assess Ms. James's mental condition prior to her date last insured. (Tr. 177).

In October 2016, State agency physician Gerald Klyop, M.D., reviewed Ms. James's records. (Tr. 184-96). He offered the same RFC as Dr. Villanueva. (Tr. 191-93). State agency physician Jennifer Swain, Psy.D., opined Ms. James had medically determinable impairments of affective disorders, anxiety disorders, and ADD/ADHD, but these were non-severe. (Tr. 189). She further opined Ms. James had no limitation in activities of daily living, maintaining social functioning, or repeated episodes of decompensation; however, she did have "mild" difficulties in maintaining concentration, persistence, or pace. (*Id.*).

## V.  OTHER RELEVANT EVIDENCE

Ms. James completed an Adult Function Report for the Agency, detailing how her conditions limit her activities.[4] (Tr. 338-41). In it, she asserts she has constant pain in her neck, shoulders, back, and hands; lacks energy; has difficulties with concentration and memory; cannot grip with her right hand; cannot sit or stand for a long time; and her feet swell when she stands for

---

[4]     The Administrative Transcript does not contain a complete report; pages containing question #6 through #12 are not available.

too long. (Tr. 338). Without warning, her legs give out on her. (*Id.*). She uses a cane for walking and has hand braces for daytime and nighttime wear. (Tr. 341).

Ms. James is limited to making simple meals, which takes about an hour with breaks. (Tr. 339). She can vacuum the rug and do laundry, but requires help carrying the laundry basket up and down the stairs. (*Id.*). Ms. James performs these chores once a week and must rest when they are done. (*Id.*). Ms. James enjoys watching television, listening to music, and playing cards. (Tr. 340). She watches television for about four to five hours a day, listens to music for one to two hours a day, and plays cards every other week. (*Id.*). Before the onset of her conditions, Ms. James was "constantly on the go, doing things." (*Id.*). Ms. James does not spend much time with others. (*Id.*). She gets along well with authority figures and has never been laid off from a job for problems getting along with others, but she does not handle stress or changes in routine well. (Tr. 341).

## THE ALJ'S DECISION

The ALJ's decision, dated September 9, 2020, included the following findings of fact and conclusions of law:

1.  The claimant last met the insured status requirements of the Social Security Act on December 31, 2015.

2.  The claimant did not engage in substantial gainful activity during the period from her alleged onset date of March 26, 2016[5], her amended onset date, through her date last insured of December 31, 2015 (20 CFR 404.1571 *et seq.*).

3.  Through the date last insured, the claimant had the following severe impairments: lumbar degenerative disc disease, fibromyalgia, obesity, osteoarthritis/degenerative joint disease of the right knee, and arthritis of the bilateral hips (20 CFR 404.1520(c)).

---

[5] The transcript from Ms. James's hearing reflects an amended onset date of March 26, 2015. (*See* Tr. 103).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except is able to occasionally lift and carry 20 pounds and frequently light and carry 10 pounds, is able to stand and walk 6 hours of an 8-hour workday, is able to sit for 6 hours of an 8-hour workday, should be afforded the opportunity to alternate between sitting and standing at 30 minute intervals; unlimited push and pull other than shown for light and/or carry; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; avoid concentrated exposure to extreme cold and extreme heat; avoid all exposure to hazards – dangerous machinery and unprotected heights; frequent handling and fingering bilaterally.

6.    Through the date last insured, the claimant was capable of performing past relevant work as a check cashier and contract clerk. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant was not under a disability, as defined in the Social Security Act, from March 25, 2015[6], the amended alleged onset date, through December 31, 2015, the date last insured (20 CFR 404.1520(f)).

(Tr. 788-97).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a

---

[6]    The hearing transcript reflects an amended onset date of March 26, 2015. (*See* Tr. 103).

reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports

the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age,

education, and past work experience to determine if the claimant could perform other work. *Id.*

Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see*

*also Walters*, 127 F.3d at 529.

DISCUSSION

In February 2020, this Court reversed and remanded the ALJ's written decision. *James v.*

*Comm'r of Soc. Sec.*, No. 1:19 CV 570, 2020 WL 836493, *6 (N.D. Ohio Feb. 20, 2020) (stating

that the Court "reverses and remands for an explained credibility/subjective symptom analysis that

properly considers Plaintiff's fibromyalgia symptoms and further explanation of the ALJ's

consideration of Plaintiff's non-severe mental impairments").

Here, after receiving another hearing and decision post-remand, Ms. James asserts "the ALJ

repeatedly focused again on selective objective evidence to determine that she was not disabled"

and erred when she "found that Ms. James was not as disabled as she claimed because she failed to

follow prescribed treatment." (Pl.'s. Br., ECF #12, PageID 1570).

I.    **The ALJ failed to provide a reasoned explanation considering Ms. James's symptoms of pain and her fibromyalgia.**

Ms. James argues the ALJ focused on normal examination findings, including normal gait,

normal range of motion, and negative straight leg raising tests to find her not as disabled as she

claimed. (*Id.* at PageID 1589). She also claims the ALJ failed to recognize the 16/18 tender points

as valid objective evidence and did not provide an explanation for why the evidence was

discredited. (*Id.* at PageID 1590).

The Commissioner responds that the ALJ, in accordance with SSR 12-2p, is expressly

allowed to consider objective medical evidence in determining the limitations caused by

21

fibromyalgia and the ALJ properly considered that Ms. James "was routinely noted to ambulate well without an assistive device; to have no edema joint deformities or SI tenderness; to have full lumbar flexion and no limitation of motion in the neck and musculoskeletal system; to have negative straight leg raising; normal muscle bulk and tone, normal and symmetrical upper and lower extremity strength; maintained sensation and reflexes; and normal mood and affect." (Comm'r's Br., ECF #13, PageID 1602, 1604).

Fibromyalgia "is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 n.3 (6th Cir. 2007); *see also* SSR 12-2p (fibromyalgia is a "complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues, that has persisted for at least 3 months"). Physical and neurological examinations typically yield normal results. *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988).

Diagnosis is based on an individual's subjective complaints of widespread pain, the presence of pain on pressure at certain tender points on the body, and manifestations of fatigue, cognitive or memory issues, waking unrefreshed, depression, anxiety, or irritable bowel syndrome. *See* SSR 12-2p. Due to the unique difficulties associated with the diagnosis and treatment of fibromyalgia, "opinions that focus solely upon objective evidence are not particularly relevant," *Rogers*, 486 F.3d at 245, thereby placing a premium on the analysis of subjective symptoms. *See Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003).

A diagnosis of fibromyalgia does not, by itself, entitle an individual to disability benefits; rather, the ALJ must analyze the claimant's symptoms. *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008); *see also* SSR 12-2p. Relevant here, SSR 12-2p states the Agency evaluates

a claimant's statements about her symptoms and functional limitation resulting from fibromyalgia using the same two-step process set forth in the regulations and SSR 96-7p.[7]

In step one, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. In step two, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* As part of this evaluation, the ALJ considers a number of factors, including:

(1)    daily activities;

(2)    the location, duration, frequency, and intensity of pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and

(7)    any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

*Id.*

The Ruling indicates the ALJ will determine if symptoms affect the claimant's ability to perform work-related activities by considering the consistency of the claimant's subjective complaints with statements made under other circumstances, the statements made at each prior

---

[7]    On March 16, 2016, the Agency issued SSR 16-3p, which supersedes SSR 96-7p. SSR 16-3p. The two Rulings are substantively similar, but SSR 16-3p eliminates the use of the term "credibility" to "clarify that subjective symptom evaluation is not an examination of an individual's character." *Id.*

step of the administrative review process, and the claimant's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed. *Id.* Specific to treatment, "if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of [the] individual's symptoms are inconsistent with the overall evidence of record." *Id.*

The Sixth Circuit recognizes that pain alone can be disabling. *See King v. Heckler*, 742 F.2d 968, 972 (6th Cir. 1984). The ALJ is not required to accept the claimant's subjective complaints and may discount a claimant's subjective testimony that the ALJ deems inconsistent with objective medical and other evidence. *Jones*, 336 F.3d at 475-76. The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p. The ALJ need not use any "magic words," so long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints or the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). However, as the Sixth Circuit has stated, "while credibility determinations regarding subjective complaints rest with the ALJ, those determinations must be reasonable and supported by substantial evidence." *Kalmbach v. Comm'r of Soc. Sec.*, 409 Fed. App'x 852, 865 (6th Cir. 2011).

24

Ms. James maintains she is limited to a reduced range of sedentary work activity due to the limiting effects of her combined impairments. (Tr. 793). The ALJ considered Ms. James's testimony that she can perform chores such as vacuuming for a short period of time, does not do the grocery shopping, has no hobbies, cannot perform outdoor activities, does not use a computer, and does not babysit due to pain. (Tr. 790). The ALJ concluded that, despite Ms. James's consistent complaints of pain ranging between 7 to 8 on a ten-point scale, she "objectively remain[ed] capable of sitting, standing, walking, traveling, shopping, and independently functioning outside of her home." (*Id.*). The ALJ found Ms. James's statements about the intensity, persistence, and limiting effects of her symptoms "inconsistent because the claimant's allegations are not supported prior to her date last insured." (Tr. 794).

The ALJ discounted Ms. James's subjective statements of pain and fatigue because Ms. James's complaints were not consistent with her presentation during the relevant period (*i.e.,* normal range of motion, strength, sensation, reflexes, and muscle tone) and she did not follow through with her medical providers' recommendations to quit smoking, begin exercising, and reduce caffeine consumption. (Tr. 795-96).

**Objective Medical Evidence**

As discussed above, objective medical evidence is not particularly relevant when analyzing the severity of pain attributed to fibromyalgia. There are instances, however, where objective medical evidence may be relevant when determining limitations caused by fibromyalgia. Arguing that consistently normal findings like full range of motion, no joint deformities, no edema, and negative straight leg raise tests, are proper considerations when determining limitations caused by

fibromyalgia, the Commissioner cites *Fox v. Comm'r of Soc. Sec.*, No. 5:19 CV 1301, 2020 WL

6568379 (N.D. Ohio July 8, 2020). (Comm'r Br., ECF #13, PageID 1604).

In *Fox*, the claimant alleged symptoms of an "extreme magnitude, testifying that she barely

gets off her recliner and sometimes spends days in bed." *Id.* at *8. The ALJ stated:

> fibromyalgia often shows a lack of objective findings, however, the symptoms one
> experiences causes restrictions that, if severe, would likely be observed. However, with
> the noted findings in the record, there are no observed significant restrictions as
> noted by the full muscle strength and tone with no atrophy findings.

*Id.* at *9. The district court concluded:

> Thus, the ALJ explained that Plaintiff's lack of muscle atrophy, full muscle strength,
> and normal gait undermined the alleged severity of her symptoms—a reasonable
> determination under the circumstances. The ALJ did not dismiss a diagnosis of
> fibromyalgia due to the lack of any objective medical test confirming its presence.
> The ALJ also did not expect the objective medical evidence to confirm the presence
> or severity of Plaintiff's alleged levels of pain. Instead, given the extremely restricted
> nature of Plaintiff's alleged activities, or more accurately, the lack thereof, it was not
> unreasonable for the ALJ to expect that such an individual's prolonged inactivity
> would manifest itself in an observable deterioration of muscle strength, mobility, or
> other observable clinical signs. In other words, the ALJ expected to see objective signs
> of Plaintiff's inactivity rather than of fibromyalgia or its associated symptoms.

*Id.* at *10.

*Fox* is distinguishable from this case. Here, Ms. James testified she could do certain

activities like vacuuming, doing laundry (which required descending and ascending stairs), and

driving, while noting that her pain limited her to shorter periods of activity. The ALJ here did not

conclude, as did the ALJ in *Fox*, that Ms. James endorsed such limited activity that the ALJ could

expect to find abnormal objective signs, such as atrophied muscles or the like.

Ms. James's argument that the ALJ erred when she did not consider Ms. James's tender

points as objective medical evidence and did not explain why she rejected such evidence is

unavailing. I note that even if the ALJ had acknowledged the tender points as objective medical

26

evidence, such a conclusion would not lead to a finding of disability because tender points establish the presence of pain at certain points on the body, not the severity of the pain felt by the individual. *See* SSR 12-2p (in testing tender-point sites, "[t]he physician considers a tender point to be positive if the person experiences *any* pain when applying [approximately nine pounds] of pressure to the site").

Nevertheless, for the reasons further described, I conclude the ALJ erred in using objective medical evidence to discount Ms. James's subjective complaints of fibromyalgia-related pain.

**Prescribed Treatment**

Even noting the objective findings, the ALJ has not relied solely on objective medical evidence in reaching her decision. The ALJ appears to attribute Ms. James's personal habits with a failure to follow her providers' prescribed treatment. She explicitly noted that Ms. James's complaints of disabling pain and fatigue were not consistent with her choice to continue smoking, thereby keeping her from getting the lumbar fusion surgery, and her failure to abide by her provider's suggestions to exercise and reduce caffeine consumption. (Tr. 795-96).

As to her alleged failure to follow treatment, Ms. James claims that the medical providers' suggestions are not "prescribed treatment." Moreover, she claims that the ALJ should have considered that Ms. James was diagnosed with nicotine dependence. (Pl.'s Br., ECF #12, PageID 1590, 1592). I decline to address these arguments as they are perfunctory, and she offers no legal authority to support her position. A party cannot leave it to the court to put flesh on the bones of an insufficiently developed argument. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

Ms. James argues the ALJ had a duty under SSR 16-3p to inquire why she did not comply with the treatment and explain how she considered the reasons for non-compliance. (Pl.'s Br., ECF

27

#12, PageID 1591). Moreover, she argues, the ALJ should have considered whether such treatment was expected to restore Ms. James's ability to work pursuant to 20 C.F.R. § 404.1530. (*Id*).

In response, the Commissioner notes that courts within this Circuit have held that "failure to seek treatment in connection with allegations of disabling pain may reasonably cast doubt on those allegations," SSR 16-3p does not require the ALJ to separately inquire about reasons for failure to comply with of treatment, § 404.1530 is not applicable here, and continued smoking despite counseling from physicians to stop is a valid consideration in evaluating a claimant's credibility. (Comm'r's Br., ECF #12, PageID 1604, 1607, 1608).

Ms. James ultimately did not have a fusion surgery to address the grade 3 anterolisthesis of L5 on S1 secondary to bilateral chronic L5 pars defect. According to the records, Ms. James did not quit smoking cigarettes, the surgeon's prerequisite to performing the fusion. (Tr. 383). The ALJ determined that Ms. James's "decision to not comply with the prescribed course of treatment mitigates her statements of the intensity of the pain." (Tr. 796).

The Commissioner is correct that the ALJ was not required to consider whether the treatment was expected to restore Ms. James's ability to work in accordance with 20 C.F.R. § 404.1530. SSR 18-3p, which offers guidance on how to apply the Agency's failure to follow prescribed treatment policy found in § 404.1530, states that the Agency will determine whether an individual has failed to follow prescribed treatment when three conditions exist, the first of which requires a finding that the individual would otherwise be entitled to disability benefits. SSR 18-3p. The ALJ did not determine Ms. James was otherwise entitled to benefits and, therefore, was not required to determine whether the prescribed treatment was expected to restore her ability to work.

The Commissioner is also correct that the ALJ is not required to "separately inquire" as to the reasons for non-compliance, so long as she considers the possible reasons. As it relates to prescribed treatment in the context of evaluating symptoms, SSR 16-3p states:

> if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of the record. We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment. . .

SSR 16-3p.

Here, the medical record contains statements from Ms. James that she wanted to postpone the surgery until after her son's wedding and she was scared. (Tr. 383-84, 394). The ALJ considered those reasons, but also considered Ms. James's failure to stop smoking, the surgeon's prerequisite to performing back surgery. (Tr. 794). The medical evidence suggests the fusion surgery was intended to improve Ms. James's low back pain that radiated into her legs; it did not indicate any benefit to Ms. James's fibromyalgia-related pain. (*See* Tr. 425). To the extent the ALJ discounted Ms. James's statements relating to *low back pain* and *radiating leg pain* on the basis that she did not undergo surgery as a result of continued smoking, the ALJ's conclusion is supported by substantial evidence.

But the ALJ also emphasizes the rheumatologist's recommendation to quit smoking, a recommendation not apparently made in connection with the lumbar fusion. (Tr. 794, 795). To the extent the ALJ discounted Ms. James's statements of *fibromyalgia-related pain* because of her continued tobacco use, this was error. The Commissioner argues that continued smoking despite a physician's recommendation to quit is a valid consideration in evaluating an individual's credibility. I do not disagree, but note that decisions from the Sixth Circuit do not support a "per

se" rule that continued smoking against the advice of a physician alone calls the individual's credibility into question.

For example, in *Sias v. Sec. of Health & Human Servs.*, 861 F.2d 475 (6th Cir. 1988), the Sixth Circuit found the ALJ's consideration of the claimant's smoking was proper where the claimant, suffering from deep vein thrombosis, claimed that he did not wear support hose as his physician suggested to alleviate leg swelling because he could not afford them despite being able to fund his two-pack-per-day habit. And in *Ninness v. Sec. of Health & Human Servs.*, 884 F.2d 580 (6th Cir. 1989) (table), the claimant's physician diagnosed her with pulmonary emphysema, coronary insufficiency, angina, prolapsing mitral valve, and migraine, and noted that her medical condition was complicated by her continuing to smoke. The Court concluded that the claimant, "despite warnings from physicians, continued to smoke two packs of cigarettes daily; this continued smoking must militate against the credibility of her claim of a completely disabling breathing disorder." *Id.* at *3.

Indeed, when analyzing an individual's statements about the intensity, persistence, and limiting effects of her symptoms, continued smoking is a valid consideration where smoking exacerbates a condition or keeps a person from engaging in treatment that might improve symptoms. Here, Ms. James did not claim she was unable to afford certain treatment, nor did the ALJ point to evidence establishing that Ms. James's fibromyalgia was complicated by her continued smoking, as she did when analyzing Ms. James's failure to undergo fusion surgery.

The ALJ found Ms. James's subjective statements of fibromyalgia-related pain not credible in part because she did not engage in exercise as recommended by her treating providers. (Tr. 796).

Notably, the ALJ did not ask Ms. James why she did not exercise despite recommendations to do so. The ALJ erred in not considering reasons for non-compliance as required by SSR 16-3p.

Finally, the ALJ discredited Ms. James's complaints of fatigue because "treatment records do not support her allegations during the relevant period. The claimant was noted to have difficulty sleeping, and she was advised to reduce caffeine and nicotine consumption." (*Id.*). Notably, the ALJ does not cite to evidence of record that indicates Ms. James even consumed caffeine.

The ALJ's suggestion that Ms. James's doctor explicitly recommended avoiding caffeine to alleviate her fatigue is a mischaracterization of the medical records; the suggestion to avoid excessive caffeine intake appears at the end of every rheumatology treatment note under Bone Health Recommendations. (*See, e.g.,* Tr. 697). Furthermore, while Ms. James was advised to stop smoking, the ALJ's written decision does not establish that reducing caffeine and nicotine consumption might improve Ms. James's fatigue, a necessary finding under SSR 16-3p.

In lieu of analyzing the consistency of Ms. James's subjective statements of pain with other evidence in the record, the ALJ focused her fibromyalgia-related pain analysis on Ms. James's failure to make lifestyle changes to quit smoking, exercise, and reduce caffeine consumption. The ALJ's determination that Ms. James's complaints of low back pain and radiating leg pain are not consistent with the evidence is reasonable in light of the fact that she did not undergo a surgery that might improve that pain. However, the ALJ does not make the necessary inquiries about Ms. James's reason for not following the recommendation to exercise, did not establish whether Ms. James actually consumes caffeine, and did not point to evidence of record establishing whether reducing caffeine and nicotine consumption might improve her fatigue. Without this information,

31

the ALJ has not built an adequate and logical bridge between the evidence and her conclusion that Ms. James's statements about her fibromyalgia-related pain are not credible. Altogether, these errors provide compelling reason to overturn the ALJ's symptom analysis.

On remand, the Court should direct the ALJ to analyze Ms. James's statements about the intensity, persistence, and functionally limiting effects of her symptoms in accordance with the requirements of SSR 16-3p.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the Court **REVERSE** the Commissioner's decision denying disability insurance benefits and **REMAND** the case for further proceedings consistent with this Report and Recommendation.

Dated: February 18, 2021

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). **Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation.** *Berkshire v. Dahl,* 928 F.3d 520, 530 (6th Cir. 2019). **Objections must be specific and not**

merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).